M. David Graubard, Esq.
Attorney for Alleged Contemnors
71-18 Main Street
Flushing, NY 11367
(212) 681-1436

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re

MOSDOS CHOFETZ CHAIM INC.,

                                        Debtor.

------------------------------------------------------------x

CONGREGANTS OF MOSDOS CHOFETZ
INC. A/K/A KIRYAS RADIN,

                                        Plaintiff

            -against-

MOSDOS CHOFETZ CHAIM INC., CHOFETZ
CHAIM INC., et. al., TBG RADIN LLC, CHEM OLAM,
LLC, CONGREGATION RADIN DEVELOPMENT
INC., ARYEH ZAKS, BEATRICE WALDMAN
ZAKS, MENDEL ZAKS, GITTEL ZAKS LAYOSH,
ELIYAHU LAYOSH, SAMUEL MARKOWITZ,
DEBORAH ZAKS HILLAN, YOM T. HENIG,
STEVEN GREEN, DANIEL GREEN, ABRAHAM
ZAKS and STERLING NATIONAL BANK,

                                        Defendants.

------------------------------------------------------------x

Chapter 11
Case No. 12-23616-rdd
Post-Confirmation

Adv. Pro No. 21-07023-rdd

PRE-TRIAL
MEMORANDUM OF LAW OF RESPONDENTS
IN OPPOSITION TO MOTION OF CERTAIN DEFENDANTS
FOR AN ORDER (I) ENTERING MONETARY JUDGMENTS AGAINST
MAYER ZAKS, NACHUM BRODY, SHIMON ZAKS, YISROEL HOCHMAN,
FAIGY HOCHMAN AND SIMA ZAKS; (II) ASSESSING ACTUAL AND PUNITIVE
DAMAGES; AND (III) ORDERING THAT A WRIT OF BODY ATTACHMENT
WILL BE ENTERED FOR ANY FUTURE VIOLATIONS OF THE
COURT'S MAY 25, 2021 INJUNCTION

The Respondents submit this Memorandum of Law in Support of their opposition to the Motion of certain Defendants for monetary damages concerning violations of this Court's Order dated May 25, 2021("Motion").

BACKGROUND

On May 25, 2021, this Court entered a Modified Order Granting Injunctive Relief ("May 25[th] Order") (Movant's Exhibit 1, hereafter numbered exhibits are those for the Movants; letter exhibits are those of the Respondents). Thereafter, this Court entered an Order Modifying a Provision in this Court's May 25, 2021 Modified Order Granting Injunctive Relief dated June 14, 2021 ("June 14[th] Order, Exhibit A).

On July 7, 2021, certain of the Defendants filed a Motion for Monetary Damages Against Mayer Zaks, Nochum Brody, Shimon Zaks, Yisroel Hochman, Faiga Hochman and Sima Zaks (collectively "Respondents") and For Related Relief (D.E. 65). In support of the Motion, the Defendants filed a Declaration of Rabbi Aryeh Zaks dated June 25, 2021 ("Aryeh Declaration") (D.E. 65).

Various acts that were alleged to have been committed by the Respondents between June 11, 2021 and June 24, 2021 were set forth on pages 8 and 9 of the Aryeh Declaration. In response to the Motion, the Respondents filed numerous certifications which disputed the material aspects of both the Moton and the Aryeh Declaration. Very detailed certifications were filed by Nochum Z. Brody dated July 19, 2021 ("Nochum Certification", D.E. 69) and by Shimon Zaks dated July 19, 2021 ("Shimon Certification", D.E. 70). The other certifications were filed by Yisroel Hochman dated July 19, 2021 ("Yisroel Certification," D.E. 71); Faigy Hochman ("Faigy Certification", D.E. 72); Sima Zaks dated July 19, 2021 ("Sima Certification", D.E. 73); and Rabbi Mayer Zaks dated July

2

19, 2021 ("Rabbi Mayer Certification", D.E. 79). All of the Certifications denied the material allegations in the Motion and in the Aryeh Declaration.

Although the Movants had the right to reply with respect to the Respondents' Certifications, Movants did not make any reply whatsoever. On the record, there are no papers from the Movants that have rebutted the allegations set forth in Respondents' Certifications.

## PERTINENT FACTS

Each of the Respondents maintains a residence on the Kiryas Radin campus ("Campus") as either a student in the yeshiva as a Rabbi/teacher in the yeshiva. Those possessery rights are long standing commitments made by Mosdos Chofetz Chaim, Inc. ("Mosdos") throughout the years on the campus. This is confirmed in a Declaration made by Rabbi Aryeh Zaks dated February 17, 2015 ("February 17th Declaration") in this bankruptcy case (Exhibit E) and the Supplemental Declaration of Rabbi Aryeh Zaks dated March 6th 2015 ("March 6th Declaration") (Exhibit H).

It was embodied in various written agreements as evidenced by the one with Nochum Z. Brody ("Nochum") (See Exhibit D and Exhibit G) and with many other students and Rabbis on the campus (See Exhibit M which are 13 campus agreements annexed to the February 17th Declaration). Pursuant to the history as outlined in the February 27th Declaration and the March 6th Declaration, the rights of occupancy for the Rabbis and the students continued as long as those Rabbis and students remain in the yeshiva on the campus.

In addition to the yeshiva, there is a congregation in the main building ("Building") on the campus. On the Sabbath there is a big minyan (which is a prayer group for religious services) on the first floor and there is a student minyan early in the morning in the basement. ("Main Minyan" and "Basement Minyan", respectively). Rabbi Mayer Zaks ("Rabbi Mayer") has been the spiritual leader of the congregation that assembles for prayer in the Building since its inception over 20 years ago. Rabbi Mayer is also the headmaster of the yeshiva.

Nochum is a son-in-law of Rabbi Mayer and has been both a student and a teacher in the yeshiva for over 10 years. Shimon Zaks ("Shimon") has also been a student and a teacher in the yeshiva for 10 years and has been davening at the congregation since he was a child. He is a son of Rabbi Mayer. Shimon and his family occupy their apartment as both a student and a teacher on the Campus.

Yisroel Hochman ("Yisroel") is a full time student in the yeshiva and has lived on campus for over five years. Yisroel is a son-in-law of Rabbi Mayer. He gives Torah classes at the synagogue and occupies his apartment as a student and a teacher.

Sima Zaks ("Sima") is the wife of Rabbi Mayer and has been attending services at the synagogue for over 20 years. Sima resides with Rabbi Mayer and occupies a residence on the Campus as his wife. Faigy Hochman ("Faigy") is the wife of Yisroel and the daughter-in-law of Rabbi Mayer. She resides with Yisroel In the apartment he occupies as a teacher and student on the Campus.

Chofetz Chaim Inc. ("CCI"), one of the Movants, never did and does not now operate a congregation for religious services on the Campus. The only members of CCI are Rabbi Aryeh Zaks ("Rabbi Aryeh") and some members of his immediate family.

4

As a result of the confirmation of the Mosdos Chapter 11 case and various transactions that resulted therefrom, Rabbi Aryeh has pushed himself into the congregation and tried to force himself as the Rabbi of the congregation. The people who assemble on the Campus for religious services do not want Rabbi Aryeh as their spiritual leader. CCI has a purported lease on the Building on the Campus. However, that purported lease does not create a congregation nor does it give Rabbi Aryeh any rights to assert himself as the spiritual leader of the congregation.

Each of the Respondents has a right to enter the Campus and occupy their respective residences as students or teachers. Each of the Respondents has the right to attend the synagogue services in the Building and moreover, Rabbi Mayer, Nochum, Shimon and Yisroel have the <u>obligation</u> to attend services in the Building pursuant to the history of the housing agreement policy of Mosdos as stated in detail in the February 27th Declaration (Paragraphs 19 through 28) and the March 6th Declaration (Exhibits E and H, respectively) as represented by the unsigned housing agreement between Mosdos and Nachum (Exhibit G) and the examples given by Rabbi Aryeh in the February 27th Declaration (Exhibit M).

Mosdos always had a real estate tax exemption from the Town of Ramapo ("Town"). After Mosdos confirmed the Chapter 11 and the property was transferred to Congregation Radin Development Inc. ("CRDI"), the Campus lost its tax exemption because the Town looked at the Campus as a real estate operation instead of a congregation and a yeshiva. Even Rabbi Aryeh himself has represented to the Town in its application for renewal the real estate exemption that CRDI is a congregation and yeshiva

5

(Exhibit K).  Nowhere is there representation or statement that <u>CCI</u> is the congregation.

To the contrary, Rabbi Aryeh has stated that it is CRDI that operates the congregation.

<u>LEGAL ARGUMENT</u>

<u>POI NT I</u>

RABBI ARYEH IS JUDICIALLY
ESTOPPED FROM DISPUTING
THE RESIDENCE RIGHTS
<u>OF THE RESPONDENTS</u>

The February 27th Declaration describes in detail the various housing

agreements that Mosdos) had with its Rabbis and students.  That section of the

February 27th Declaration is entitled "Housing Agreements."

Basically, those Housing Agreements provided that the Rabbis and students who

attend the Yeshiva there live rent free as long as they stay as students in the Yeshiva.

In paragraph 26 thereof, Rabbi Aryeh states the following:  "Although the agreements

for the students were for one year and many students are now five years or more in the

advanced programs, these documents were not renewed or updated."  In addition, in

paragraph 21 thereof,  Rabbi Aryeh specifically states the following:  "KOLLEL

STUDENTS DO NOT PAY FOR LIVING ON CAMPUS (capital lettering in original)".

In the Motion, Rabbi Aryeh has taken a <u>completely opposite</u> position from the

one in his February 27th Declaration.  In the Rabbi Aryeh Declaration, the claim is made

that Nochum  never executed an extension to his housing agreement and nowhere is

there written permission given for him to remain in that unit (Aryeh Declaration, p. 7,

footnote 2 continued) (D.E. 65).  In the same footnote, the claim is made that Yisroel

Hochman moved into a unit that without any permission and without any housing agreement. Then Hochman is called a "squatter."

Clearly, the position taken by Rabbi Aryeh in the Aryeh Declaration is <u>exactly opposite</u> from the position that he took in the February 27th Declaration. Rabbi Aryeh is judicially estopped from taking the position in the Aryeh Declaration that any of the Respondents have no right to apartments on the Campus based upon the emphatic argument he made in the February 27th Declaration that existing agreements were not renewed and that all the students do not pay for living on campus as long as they are students in the Yeshiva.

This precise issue was raised in the case of <u>Rissetto v. Plumbers & Steamfitters Local 243</u>, 94 F3d 597 (9th Cir., 1996) in which the Court made an exhaustive search on the issue of judicial estoppel and came to the conclusion that the plaintiff therein, who had obtained a favorable settlement from the State Compensation Insurance Fund on the basis that she could not work for physical reasons due to disability, could not claim in later litigation against her labor union on a claim for age discrimination that she was performing her job adequately. 94 F.3d at 606

> The Court in <u>Rissetto</u> stated the following definition of judicial estoppel:
>
> "Judicial estoppel, sometimes also known as the doctrine of <u>preclusion of Inconsistent positions</u>, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." <u>Ibid.</u> at 601 (emphasis added)
>
> Moreover, the Court in <u>Rissetto</u>, <u>supra</u>, discussed the intent and purpose of judicial estoppedl:
>
> "The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings ... Judicial estoppel is intended to protect

7

against a litigant playing fast and loose with the courts....Because it is intended to protect the dignity of the judicial process, it is an equitable doctrine invoked by a court at its discretion." 94 F.3d at 601, citing Yanez v. United States, 980 F.2d 323, 326 (9th Cir. 1993) and Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir 1990) cert. denied 501 U.S. 1260 (1991).

This principle arises most often in Bankruptcy Courts when a debtor takes a position in litigation that is inconsistent with the information the debtor has put in his/her Bankruptcy Schedules. In re Moore, 269 B.R. 864, 869 (Bankr. Dist. Idaho, 2001). Clearly, Rabbi Aryeh has taken inconsistent positions with regard to the housing agreements on the present Motion and in the February 27th Declaration. Therefore, this Court must apply the judicial estoppel principle to prevent the Movants from gaining and obtaining an unfair advantage in litigation which is this Motion. The claim on the Motion is clearly and unquestionably inconsistent with the position on the housing agreements espoused by Rabbi Aryeh in February 27th Declaration.

It is such an inconsistent position that the Court in Hamilton v. State Farm Fikre and Casualty Company, 270 F.3d 778 (9th Cir., 2001) used to prevent a debtor who had not listed a property insurance claim in his Bankruptcy Schedules from suing the insurance company on that same claim after he obtained his discharge in bankruptcy. The Court found that the debtor had "clearly asserted inconsistent positions." (270 F.3d at 784) and the Court stated "we must invoke judicial estoppel to protect the integrity of the bankruptcy process." (Ibid at 785). So too, in order to protect the judicial bankruptcy process, Rabbi Aryeh is estopped from claiming that the Respondents do not have valid residence rights on the Kiryas Radin campus.

Accordingly, all of the Respondents and their immediate families have the right,

8

if not the obligation, to attend services in the Building and learn in the yeshiva as an incident of their housing rights under the long established history of Mosdos providing housing on the Campus for its students and teachers.

## POINT II

### THE RESPONDENTS HAVE THE RIGHT<br>TO ATTEND RELIGIOUS SERVICES<br>AND TO LEARN IN THE YESHIVA<br>IN THE BUILDING

Rabbi Aryeh in his own words (February 27th Declaration and March 6th Declaration, Exhibit E and H, respectively) unequivocally stated the right of the yeshiva students and the Rabbis at the yeshiva to learn in the yeshiva building and to attend the services in the Building. In fact, it was an <u>obligation</u> of the students and Rabbis who lived on the Campus to attend services in the Building as part of their stipend from Mosdos that provided complimentary housing. (Exhibits E and H).

The attendance to learn in the yeshiva and pray in the congregation was a historically recognized right and obligation for over 20 years on the Campus. Only after Mosdos confirmed its Chapter 11 with the real estate transactions that occurred thereafter, did the rules change for the sole purpose that Rabbi Aryeh wanted to install himself as the spiritual leader of the Congregation. At that point, Rabbi Aryeh became a real estate operator (not an aspiring spiritual leader) and sought the aid of the Bankruptcy Court to exercise the rights of a landlord to exclude people who allegedly "trespassed" on the Campus.

The June 14th Order (Exhibit A) had an exculpation clause to explain the terms of the May 25th Order. The proviso in the June 14th Order stated as follows:

9

"Provided, and for the avoidance of doubt, this Order shall not
be construed as permitting CRDI or CCI to bar any person who (i)
has a valid written lease from CRDI, or (ii) has the legal right
to possession of such residential unit pursuant to New York
law (and is not a squatter) from entering the CRDI Property
for the purpose of entering, occupying or exiting his or her
leased unit thereon or any other appurtenant rights."

Each of the Respondents clearly fits into the category of this Proviso. Each one

has the right to possession of a residential unit as a Rabbi and/or a student in the

yeshiva on the Campus as acknowledged by Rabbi Aryeh in the February 27th

Declaration (Exhibit E) and the March 6th Declaration (Exhibit H).

In addition to occupying the housing unit on the Campus, each of the Rabbis

and/or students has the right to learn in the yeshiva and attend services in the

synagogue in the Building as an "appurtenant right" stated in the June 14th Order

(Exhibit A).

Black's Law Dictionary defines appurtenant as follows:

"APPURTENANT. Belonging to; accessory or incident to; adjunct,
appended, or annexed to; answering to *accessorium* in the civil
law. 2 Steph. Comm. 30 note. McClintic-Marshall Co. v. Ford
Motor Co., 254 Mich. 305, 236 N.W. 792, 795; Being employed
in leases for the purpose of including any easements or servitudes
used or enjoyed with the demised premises. Riddle v. Littlefield,
53 N.H. 508, 16 Am.Rep. 388."

It cannot be disputed that the right to learn and pray on the Campus is an adjunct

right under the housing policy of Mosdos. "Appurtenant rights include such privileges

which are incident and necessarily connected the real estate." IDEA Boardwalk, LLC v.

Revel Entertainment Group, LLC (In re Revel AC, Inc.), 532 B.R. 216, 229 (Bankr. D.

N.J., 2015). The right to pray and the right to learn fall squarely within this description

by the Bankruptcy Court in New Jersey.

10

The case law in New York has described various instances in which appurtenant rights have been upheld. In 487 Elmwood, Inc. v. Hassett, 107 A.D.2d 285 (4th Dept., 1985), the Court recognized the right of a commercial tenant to use the parking area that was commonly used by the other tenants in the building as an appurtenant right, The Court noted other cases in New York that held various situations to constitute appurtenant rights such as a residential tenant's right to use a hallway lavatory; a commercial tenant's right to use a freight elevator; or merely changing or limiting the means of ingress and egress even without denying access to the leased premises. 107 A.D.2d at 287.

In Sterling Investor Services, Inc. v. 1155 Nobo Associates LLC, 30 A.D.3d 579, (App Div, 2nd Dept.) the tenant had usage of the lunchroom, conference room, reception desk, atrium and underground parking spaces all of which were defined as appurtenant rights under its lease. 30 A.D.3d at 580. Another example of an appurtenant right was the ability to exclude other tenants from erecting exterior signs by a tenant who leased the entire floor of a building. Stahl & Jaeger v. Satenstein, 233 N.Y. 196, 197 (1922); Lent & Graff Company v. Satenstein, 210 A.D. 251, 254 (1st Dept., 1924).

Appurtenant rights refer to use of physical property as in the 487 Elmwood, supra and Sterling Investor, supra, cases and non-physical rights such as the right to exclude other tenants under the Stahl, supra, and Lent, supra, cases. The appurtenant rights to learn in the yeshiva and pray in the congregation in the Building seem to have aspects of both types of appurtenant rights. The Respondents both physically enter the Building and then to exercise their non-physical right to pray and to learn.

Accordingly, it cannot be denied that the Respondents, as legal occupants of

11

units on the Campus, have the appurtenant right (as fully discussed in detail in Rabbi

Aryeh's own words in the February 27th Declaration) (Exhibit E) to learn in the yeshiva

and pray at the synagogue in the Building.

### POINT III

### THE BOARD OF CCI HAS NO RIGHT TO HIRE, FIRE OR RETAIN A RABBI

Rabbi Mayer has been the spiritual leader of the synagogue at the Building on

the Campus for over 20 years. Nobody can dispute that fact. His position as Rabbi

cannot be altered in any aspect whatsoever by the Board of Trustees of any entity that

claims to be the landlord or the tenant of the Building.

Section 5 of the Religious Corporations Law of the State of New York ("RCL") is

entitled "General Powers and Duties of Trustees of Religious Corporations." (emphasis

added)  Section 5 generally discusses the rights and powers of the Board of Trustees of

a religious corporation including various financial aspects of the operation of the

religious corporation.  At the end of Section 5, the statute provides as follows:

> "But this section does not give to the trustees of an
> incorporated church, any control over the calling,
> settlement, dismissal or removal of its minister, or
> the fixing of his salary; or any power to fix or change
> the times, nature or order of the public or social
> worship of such church."  (emphasis added)

A companion statute under the RCL is Section 200 entitled "Control of Trustees

by Corporate Meetings; Salary of Ministers".  The relevant part of that section

specifically states:  "The trustees of an incorporated church to which this article is

applicable, shall have no power to settle or remove or fix the salary of the minister, ..."

The case law has followed the RCL with respect to a Board of Trustees not

having power to hire, fire or retain its spiritual leader.  In the leading case of <u>Kamchi v. Weissman</u>, 125 A.D.3d 142 (2nd Dept., 2014) the Court specifically noted that RCL §200 and RCL §5 prevent the Board of Trustees from interfering with the status of the Rabbi of the congregation.

As the Court in <u>Kamchi v. Weissman, supra</u> noted:

> "The relatively few courts that have addressed the matter are in agreement that <u>Religious Corporation Law §200</u> precludes trustees from 'settling' or 'removing' the minister (see <u>Watt Samakki Dhammikaram, Inc. v. Thenjitto, 166 Misc 2d 16, 20, 631 NYS 2d 229 [Sup Ct, Kings County 1995]; Zimbler v. Felber, 111 Misc.2d 867, 880-881, 445 NYS 2d 366 [Sup Ct, Queens County 1981]; Kupperman v. Congregation Nusach Sfard of The Bronx, 39 Misc. 2d 107, 113, 240 NYS 2d 315 [Sup Ct, Bronx County 1963; cf. People v. Tuchinsky, 100 Misc.2d 521, 523, 419 NYS2d 843 [1979]).</u>"  125 A.D.3d at 154.

In the case of <u>Loren v. Arbittier</u>, 2016 N.Y. Misc. LEXIS 3706 *; 2016 WL 5958103 (Sup. Crt., N.Y. Cty. 2016), the Court noted its striking similarity to <u>Kamchi v. Weissman, supra</u>, and determined  that under RCL §5 and RCL §200, "the <u>members</u> of the congregation have rights that may <u>not</u> be usurped by the board, such as the right to vote on <u>whether a rabbi is hired, fired or retained</u>, citing <u>Kamchi v. Weissman, supra</u> *8.

It is absolutely clear and cannot be disputed that CCI, acting by its Board of Trustees, has no right whatsoever to compromise, affect or interfere with the rights of Rabbi Mayer as the spiritual leader of the congregation and the rights of that congregation to choose its own Rabbi.   By insisting that CCI has installed Rabbi Aryeh as the spiritual leader of the congregation that meets at the Building on the Campus, the Defendants have violated Sections 5 and 200 of the RCL and illegally impinged on the rights of the congregation to choose its Rabbi and of Rabbi Mayer to be the spiritual leader of that congregation.

13

This Court has improperly intruded into the congregation's protections under the First Amendment to the Constitution by resolving any controversy that may concerning the religious doctrine of the congregation. The right of a religious organization to create its own method of governing rights is crucial to the protection of religious under the First Amendment. Servian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 724-725 (1976).

Allowing Rabbi Aryeh to use the mechanism of the Bankruptcy Court through the Board of CCI to install him as the Rabbi of the congregation in the Building, has created an improper entanglement of the Bankruptcy Court with religious doctrine which is prohibited by the First Amendment.

This is not a situation of enforcing or interpreting a written contract between a Rabbi of a congregation which involves interpretation of secular contract rules or copyright infringement of religious articles. Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 99-100 (2nd Cir., 2002).

The effect of this Court's various orders has given Rabbi Aryeh the claim that he is the spiritual leader at the synagogue on the Campus. In the Aryeh Declaration he calls it "*my*" congregation (Aryeh Declaration, par. 5) which in itself runs afoul of RCL §5 and §200. Judicial "second guessing of decision having making by religious organizations" is exactly what leads to impermissible court involvement that violates the First Amendment. Scharon v. St. Luke's Episcopal Presbyterian Hospitals, 929 F.2d 360, 363 (8th Cir., 1991).

There is no way that Rabbi Aryeh, using this Court to improperly establish himself as the spiritual leader of the congregation, can avoid violating the First

Amendment and RCL §5 and §200. The Movants have completely failed to show that any of the congregants or rmembers of the synagogue desire to change any of the synagogue operations or spiritual leader. The Respondents have amply demonstrated that the opposite is true..

## CONCLUSION

The Respondents have demonstrated that they are entitled to their occupancy rights on the Campus. Rabbi Aryeh's attempts to void those rights by claiming that housing agreements expired or were not enforced or some other excuse are of no value. He is estopped from claiming.otherwise by his own February 27th Declaration.

The housing agreements prepared by Mosdos itself give the Respondents the right to occupy units on the Campus. Even moreso, those housing agreements obligate the Respondents to attend services in the Building.

The right of the congregation to choose its own Rabbi is guaranteed by the Religious Corporation Laws of the State of New York. Any attempt by Rabbi Aryeh to use this Court to install himself as the spiritual leader of the congregation in the Building runs afoul of the First Amendment of the Constitution.

Accordingly, the Motion by the Defendants must be denied.

Dated:    Flushing, New York
July 19, 2021

M. DAVID GRAUBARD, ESQ.
Attorneys for Alleged Contemnors

By:_____
M. David Graubard (MDG 5442)
7118 Main Street
Flushing, NY 11367
(212) 681-1436
dgraubard@keragraubard.com

15